UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BAY FARMS CORPORATION,

        Plaintiff,

vs.                                Case No. 8:10-CV-2460-T-27EAJ

GREAT AMERICAN ALLIANCE
INSURANCE COMPANY,

        Defendant.

_____/

## ORDER

**BEFORE THE COURT** are Bay Farms Corporation's Opposition Motion for Partial Summary Judgment (Dkt. 45) and Defendant, Great American Alliance Insurance Company's Cross-Motion for Partial Summary Judgment (Dkt. 46). The Court heard oral argument on the parties' motions during a hearing on November 22, 2011. Upon consideration, Bay Farms Corporation's Opposition Motion for Partial Summary Judgment (Dkt. 45) will be **GRANTED** and Defendant, Great American Alliance Insurance Company's Cross-Motion for Partial Summary Judgment (Dkt. 46) will be **DENIED**.

## Introduction

This is an action for damages and declaratory relief arising out of an insurance policy issued by Great American Alliance Insurance Company ("**Great American**"). Bay Farms Corporation ("**Bay Farms**") claims that Great American has failed to compensate it for property damage caused by sinkhole activity. The issue before the Court on the parties' cross-motions for partial summary judgment is whether a 2011 amendment to the Florida statutory scheme governing sinkhole insurance that for the first time added a statutory definition of "structural damage" should be applied

retroactively to the insurance policy at issue or, in the alternative, whether the term "structural damage" in the policy should be treated as an undefined term.[1] Because retroactive application of the statutory definition of "structural damage" would impair Bay Farms' vested contractual rights under the policy, Bay Farms' motion for partial summary judgment is due to be granted and Great American's cross-motion for partial summary judgment is due to be denied.

## Background

Bay Farms is the owner of certain real property located in Ocala, Florida, which it operates as a breeding and training farm for race horses (the "**Insured Property**"). Great American issued one or more insurance policies covering the Insured Property, including a policy effective between November 15, 2008, and November 15, 2009. *See* Policy No. APK 1-95-29-89-D5, attached to the Complaint as Exhibit A (the "**Policy**").

In or about September of 2009, Bay Farms submitted a claim under the Policy for sinkhole losses allegedly arising from damage to structures on the Insured Property. Bay Farms subsequently revised its claim to cover additional buildings on the Insured Property. Great American contends that of the 26 buildings that have reportedly suffered damages due to sinkholes, "25 of the 26 buildings have relatively minor cosmetic cracking damage." Dkt. 46, ¶ 6. Great American has indicated its intention to deny coverage as those buildings with only cosmetic damage based on the purported absence of "structural damage" to covered property.

---

[1] While Bay Farms requests a determination that none of a series of amendments to Florida's statutory scheme governing sinkhole insurance apply retroactively, the key issue framed by the parties' cross-motions for partial summary judgment is the definition of "structural damage" in the insurance policy at issue. *See, e.g.*, Dkt. 45, pp. 4-5; Dkt. 46, ¶¶ 12, 21. As such, this Order addresses only whether the statutory definition of "structural damage" can be applied retroactively. To the extent Great American asks the Court to determine whether the pre or post amendment version of section 627.7074 would apply if either party elects to proceed with neutral evaluation in the future, the Court declines to provide what essentially would amount to an advisory opinion.

### *The Policy Language*

The Policy provides in pertinent part: "Sinkhole Loss means loss or damage to Covered Property when ***structural damage*** to the building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the building ... ." Florida Changes Endorsement, § I (emphasis added). The Policy does not define the term "structural damage." Moreover, the Policy does not purport to incorporate by reference any existing statutory definitions nor does it include language expressly making changes to statutory definitions retroactively applicable to claims arising under the Policy.

### *Florida's Statutory Scheme Relating to Sinkhole Insurance*

In 1981, the Florida Legislature adopted a statutory provision requiring that every insurer authorized to write property insurance policies in Florida make available coverage for "sinkhole losses" to certain structures and personal property. As originally enacted, this statutory provision provided in pertinent part:

> (1) Every insurer authorized to transact property insurance in this state shall make available coverage for insurable sinkhole losses on any structure, including contents of personal property contained therein, to the extent provided in the form to which the sinkhole coverage attaches.

> (2) "Loss" means ***structural damage*** to the building. Contents coverage shall apply only if there is ***structural damage*** to the building.

> (3) "***Sinkhole loss***" means actual physical damage to the property covered arising out of or caused by sudden settlement or collapse of the earth supporting such property only when such settlement or collapse results from subterranean voids created by the action of water on a limestone or similar rock formation.

* * * * *

3

Fla. Stat. § 627.706 (1981) (emphasis added).   In 2005, the Legislature removed the separate definition of "loss" and redefined "sinkhole loss" as "*structural damage* to the building, including the foundation, caused by sinkhole activity."   2005 Fla. Sess. Law. Serv. Ch. 2005-111, § 17 (emphasis added).   The Legislature retained the restriction limiting contents coverage to those situations where "there is *structural damage* to the building caused by sinkhole activity."   *Id.* (emphasis added).   While the 2005 amendment limited the definition of "sinkhole loss" to cases where there was "structural damage" to covered property, the amendment did not define the term "structural damage."[2]

In 2011, the Legislature for the first time adopted a definition of "structural damage" to be applied when interpreting insurance policies providing coverage for sinkhole losses.   *See* 2011 Fla. Sess. Law. Serv. Ch. 2011-39, § 22 (the "**2011 Amendment**").[3]   Pursuant to the Enabling Act, the 2011 Amendment went into effect on May 17, 2011 (*i.e.*, the date it was signed by the Governor and

---

[2] While the parties focus on this 2005 amendment to section 627.706 as the starting point for their statutory analysis, it is telling that the term "structural damage" remained undefined in the statute from the date of its enactment in 1981 through the 2011 amendment at issue.

[3] The 2011 Amendment was one component of a broad piece of legislation by which the Legislature effected numerous changes to the Florida statutory scheme governing property insurance, including section 627.706 and other statutory provisions relating to sinkhole coverage.   *See* 2011 Fla. Sess. Law. Serv. Ch. 2011-39 (collectively, the "**Enabling Act**").   For example, the Legislature revised various statutory definitions relating to what constitutes a sinkhole loss, removed the requirement that privately owned property insurers must offer sinkhole coverage, revised procedures relating to standards for sinkhole insurance claim investigations, and revised the neutral evaluation process for sinkhole disputes.   *See id.*

4

became law). *See* 2011 Fla. Sess. Law. Serv. Ch. 2011-39, § 32.[4] As amended, section 627.706 provides:

> (2)   As used in ss. 627.706-627.7074 and *as used in connection with any policy providing coverage for* a catastrophic ground cover collapse or for *sinkhole losses*, the term:
>
> * * * * *
>
> (j)   "Sinkhole loss" means *structural damage* to the covered building, including the foundation, caused by sinkhole activity. Contents coverage and additional living expenses apply only if there is *structural damage* to the covered building caused by sinkhole activity.
>
> * * * * *
>
> (k)   "*Structural damage*" means a covered building, regardless of the date of its construction, has experienced the following:
>
> > 1.   Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement-related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code;

---

[4] House Amendment 1 to Senate Bill 408 deleted language that would have expressly limited the retroactive effect of changes affecting substantive rights to claims reported on or after July 1, 2011, and changes affecting procedural rights to claims reported on or after February 1, 2011. *See* FL Staff An., S.B. 408, 5/5/2011. Specifically, the original version of the legislation that was approved by the Senate and submitted to the House included the following relevant language:

> Section 34.   The amendments made by this act to ss. 627.706-627.7074, Florida Statutes, and the accompanying legislative findings related to those statutes, which affect procedural rights, do not apply to insurance claims reported to an insurer before February 1, 2011, but do apply to claims reported to an insurer on or after that date. Amendments made by this act to ss. 627.706-627.7074, Florida Statutes, and the accompanying legislative findings related to those statutes, which affect substantive rights, apply to claims reported to an insurer on or after July 1, 2011.
>
> Section 35.   Except as otherwise expressly provided in this act and except for this section, which shall take effect June 1, 2011, this act shall take effect July 1, 2011.

2011 FL S.B. 408 (April 28, 2011); *see also* FL Staff An., S.B. 408, 4/7/2011 ("claim costs associated with sinkhole loss may increase in the short term with the passage of this bill, as a number of policyholders may file sinkhole damage claims alleging damage that occurred before the effective date of the reforms contained in this bill").

2. Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement-related damage to the primary structural members or primary structural systems that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those primary structural members or primary structural systems exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

3. Damage that results in listing, leaning, or buckling of the exterior load-bearing walls or other vertical primary structural members to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

4. Damage that results in the building, or any portion of the building containing primary structural members or primary structural systems, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

5. ***Damage occurring on or after October 15, 2005***, that qualifies as "substantial structural damage" as defined in the Florida Building Code.

Fla. Stat. § 627.706(2)(k) (2011) (emphasis added). Thus, the 2011 Amendment indirectly modified the definition of "sinkhole loss" by adding a new and highly technical definition for the previously undefined term "structural damage."

The Legislative findings and declarations accompanying the 2011 Amendment demonstrate that the Legislature was concerned about the impact the growing number and severity of sinkhole insurance claims had on Citizens Property Insurance Corporation and the private insurance market.

*See* 2011 Fla. Sess. Law. Serv. Ch. 2011-39 , § 21.  Specifically, the Legislature found and declared

as follows:

(1)   There is a compelling state interest in maintaining a viable and orderly private-sector market for property insurance in this state. The lack of a viable and orderly property market reduces the availability of property insurance coverage to state residents, increases the cost of property insurance, and increases the state's reliance on a residual property insurance market and its potential for imposing assessments on policyholders throughout the state.

(2)   In 2005, the Legislature revised ss. 627.706-627.7074, Florida Statutes, to adopt certain geological or technical terms; to increase reliance on objective, scientific testing requirements; and generally to reduce the number of sinkhole claims and related disputes arising under prior law.   The Legislature determined that since the enactment of these statutory revisions, both private-sector insurers and Citizens Property Insurance Corporation have, nevertheless, continued to experience high claims frequency and severity for sinkhole insurance claims.  In addition, many properties remain unrepaired even after loss payments, which reduces the local property tax base and adversely affects the real estate market.   Therefore, the Legislature finds that losses associated with sinkhole claims adversely affect the public health, safety, and welfare of this state and its citizens.

(3)   Pursuant to sections 22 through 27 of this act, technical or scientific definitions adopted in the 2005 legislation are ***clarified to implement and advance the Legislature's intended reduction of sinkhole claims and disputes***.  Certain other revisions to ss. 627.706-627.7074, Florida Statutes, are ***enacted to advance legislative intent*** to rely on scientific or technical determinations relating to sinkholes and sinkhole claims, reduce the number and cost of disputes relating to sinkhole claims, and ensure that repairs are made commensurate with the scientific and technical determinations and insurance claims payments.

2011 Fla. Sess. Law. Serv. Ch. 2011-39 , § 21 (emphasis added).

A Florida Senate Bill and Fiscal Impact Statement ("**Senate Analysis**") noted that the 2011 Amendment "*revises* what constitutes a sinkhole loss" and "*revises* procedures for insurers and policyholders relating to standards for sinkhole insurance claim investigations and revises the neutral evaluation process for sinkhole disputes ... ." FL Staff An., S.B. 408, 4/7/2011, at p. 2 (emphasis added).[5] In discussing the need for these revisions, the Senate Analysis noted:

> Nationally, property insurance policies typically exclude coverage for "earth movement." In contrast, Florida requires every authorized insurer to make coverage for "sinkhole loss" available, for an additional premium, and also to provide coverage for catastrophic ground cover collapse. "Sinkhole loss," is defined by statute as "structural damage to the building, including the foundation, caused by sinkhole activity." In summary, under current law, for a policyholder to have a sinkhole loss, there must be actual structural damage to her or his home, including the foundation, which is "caused by" sinkhole activity. *However, while "sinkhole activity" is defined in statute, "structural damage" is not, which has led to the term not being used in a uniform manner and has spawned debate in litigation over the meaning of the term.*
>
> \* \* \* \* \*
>
> *The result is uncertainty as to how the Florida Statutes define sinkhole loss and precisely what coverage Florida Statutes mandate insurers make available.* The term "structural damage" is currently being defined in one of two ways. Some parties state that the term means simply "damage to a structure." The second definition asserts that structural damage is damage that affects the load bearing capacity of the structure.
>
> \* \* \* \* \*
>
> The *revisions* to the statutes governing sinkhole coverage should reduce the number of sinkhole claims and disputes, ultimately reducing the losses associated with such claims. The *reforms* should reduce premium costs for policyholders purchasing residential property insurance.

_____

[5] The Senate Analysis expressly indicates that it "does not reflect the intent or official position of the bill's introducer or the Florida Senate." FL Staff An., S.B. 408, 4/7/2011, at p. 36. Nonetheless, Florida courts have recognized that legislative staff summaries may be consulted in an attempt to discern legislative intent. *See, e.g., Ellsworth v. Insurance Co. of North America*, 508 So.2d 395, 398, 401 n.3 (Fla. 1st DCA 1987).

FL Staff An., S.B. 408, 4/7/2011 (emphasis added).  While the Senate Analysis indicates that there was uncertainty as to the meaning of the term "structural damage" prior to the 2011 Amendment, the Senate Analysis references no conflicting judicial, legislative, or executive authority.

### *The Pending Coverage Dispute*

The undisputed evidence demonstrates that absent the 2011 Amendment, Bay Farms' claim involved "structural damage" to covered property so as to fall within the definition of "sinkhole loss" in the Policy.  *See, e.g.*, Deposition of Thomas Miller (Dkt. 45-1), pp. 74-77, 83, 119.  Moreover, it is undisputed that the Policy was issued, the subject losses occurred, and the subject claim was submitted to Great American prior to the effective date of the 2011 Amendment.  Nonetheless, Great American contends that at least a portion of Bay Farms' claim is not covered because the 2011 Amendment retroactively narrowed the scope of sinkhole coverage provided by the Policy.

### <u>Summary Judgment Standard</u>

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

### Discussion

The Supreme Court of Florida has adopted a two-pronged analysis for determining when a ***substantive*** statutory amendment should be retroactively applied to an insurance policy issued prior to the amendment. *See, e.g., Menendez v. Progressive Express Ins. Co.*, 35 So.3d 873, 876 (Fla. 2010).

> Two interrelated inquiries arise when determining whether statutes should be retroactively applied. The first inquiry is one of statutory construction: whether there is clear evidence of legislative intent to apply the statute retrospectively. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Hassen v. State Farm Auto. Ins.*, 674 So.2d 106, 108 (Fla. 1996). If the legislation clearly expresses an intent that it apply retroactively, then the second inquiry is whether retroactive application is constitutionally permissible. *See State Farm Mut. Auto. Ins. v. Laforet*, 658 So.2d 55, 61 (Fla. 1995); *State Dep't of Transp. v. Knowles*, 402 So.2d 1155, 1158 (Fla. 1981); *see also Arrow Air, Inc. v. Walsh*, 645 So.2d 422, 425 n.8 (Fla. 1994).

*Florida Hospital Waterman, Inc. v. Buster*, 984 So.2d 478, 487 (Fla. 2008) (quoting *Metropolitan Dade County v. Chase Federal Housing Corp.*, 737 So.2d 494, 499 (Fla. 1999)). Since this two-pronged analysis only applies to substantive changes in the law, the Court must first determine whether the 2011 Amendment is procedural or substantive.

10

### *Procedural or Substantive Amendment*

Great American argues that the normal presumption against retroactive application of a statute does not apply in this case because the 2011 Amendment was merely procedural or remedial. In essence, Great American contends that because the 2011 Amendment was intended to "clarify" or "amend" a definitional provision in the statute (*i.e.*, the definition of "sinkhole loss"), the Court should presume that the Legislature intended the amendment to apply retroactively. *See Arrow Air, Inc. v. Walsh*, 645 So.2d 422, 424 (Fla. 1994) (noting that when an act is remedial, "an intent that the new law be applied to pending cases should be presumed") (citing *Martin County v. Edenfield*, 609 So.2d 27, 29 (Fla. 1992) (concluding that public sector Whistle-Blower's Act was "remedial")).[6]

While it is true that procedural or remedial statutes may operate retrospectively even absent a clear legislative intent in favor of retroactivity, *see Weingard v. Miles*, 29 So.3d 406, 409 (Fla. 3d DCA 2010), that is not the case with respect to amendments that constitute a substantive change, either by creating new rights or taking away vested rights. *See Arrow Air, Inc.*, 645 So.2d at 424. That is, "if a statute accomplishes a remedial purpose by creating new substantive rights or imposing new legal burdens, the presumption against retroactivity would still apply." *Chase Federal*, 737 So.2d at 500 n. 9; *accord R.A.M. of South Florida, Inc. v. WCI Communities, Inc.*, 869 So.2d 1210, 1217 (Fla. 2d DCA 2004); *see State Farm Mut. Auto. Ins. v. Laforet*, 658 So.2d 55, 61 (Fla. 1995) (finding that even though the Legislature expressly stated that amendment was remedial and was to be applied retroactively, it was substantive and could not be applied retroactively because it significantly altered the language used to determine fines imposed on a violator).

---

[6] Great American also appears to contend that because the 2011 Amendment was remedial, curative, or procedural it should be presumed constitutional. Because the Court concludes that the 2011 Amendment is substantive, the Court need not address whether a clarifying amendment that was merely curative or procedural could be applied retroactively even if it impacted vested rights.

As an initial matter, Great American's attempt to apply the 2011 Amendment to narrow the scope of coverage afforded by the Policy is inconsistent with the general rule that "the statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract." *Hassen v. State Farm Mut. Auto. Ins. Co.*, 674 So.2d 106, 108 (Fla. 1996) (citing *Lumbermens Mut. Cas. Co. v. Ceballos*, 440 So.2d 612, 613 (Fla. 3d DCA 1983)). Prior to the 2011 Amendment, the term "structural damage" in the Policy would have been construed according to its plain meaning (*i.e.*, damage to a structure) with any ambiguity construed in favor of Bay Farms. *See, e.g.*, *Ernie Haire Ford, Inc. v. Universal Underwriters Ins.*, 541 F.Supp.2d 1295, 1298 (M.D. Fla. 2008); *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005); *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000); *see also Bethel v. Security Nat'l Ins. Co.*, 949 So.2d 219, 222 (Fla. 3d DCA 2006) ("When an insurer fails to define a term in a policy, the insurer cannot take the position that there should be narrow, restrictive interpretation of the coverage provided.").[7] Moreover, there is no indication in the record that at the time the Policy was executed the parties could have contemplated, let alone bargained for, the highly "technical" definition adopted by the Legislature in the 2011 Amendment. *See also Dewberry v. Auto-Owners Ins. Co.*, 363 So.2d 1077,

---

[7] At least two Florida cases decided prior to the 2011 Amendment interpreted the term "structural damage" in accord with its plain meaning. *See Bissel, Jr. v. United Services Auto. Ass'n*, Case No. 51-2010-CA-008524 (Fla. 6th Jud. Cir. April 20, 2011) ("The court finds as a matter of law that any damage to any part of Plaintiffs' home, or other covered property, caused by the sinkhole constitutes "'structural damage'."); *Manso v. United Services Auto. Ass'n*, Case No. 08-5173 (Fla. 6th Jud. Cir. Mar. 2, 2010) ("The court finds as a matter of law that the term 'structural damage' within the subject insurance policy and as set forth in [the pre-amended version of] Fla. Stat. § 627.706, means damage to the structure, in this case, the house.").

1081 (Fla. 1978) (noting that individuals cannot be charged reasonably with notice of the consequence of impending legislation before the effective date of that legislation).[8]

Great American's argument to the contrary, a plain reading of the 2011 Amendment reveals that the new definition of "structural damage" is a substantive change as its retroactive application would adversely affect and impair the right of sinkhole policyholders, including Bay Farms. *See Arrow Air, Inc.*, 645 So.2d at 424 ("[the Supreme Court of Florida] has never classified a statute that accomplishes a remedial purpose by creating substantive new rights or imposing new legal burdens as the type of 'remedial' legislation that should be presumptively applied in pending cases"); *see also Menendez*, 35 So.3d at 880 (holding statutory presuit notice provision was "substantive," not "procedural" and should not be given retroactive application); *Hassen*, 674 So.2d at 108 (Fla. 1996) (statute requiring under insured motorist carrier to pay amount of offer from liability insurer within 30 days in order to preserve subrogation claim was not procedural or remedial change, but rather was substantive amendment operating prospectively, not retroactively).   In this case, the technical definition of "structural damage" in the 2011 Amendment significantly narrows the definition of "sinkhole loss," which in turn narrows Bay Farms' rights under the Policy.   Indeed, the substantive nature of the 2011 Amendment is readily evidenced by Great American's own position in this litigation.   That is, Great American recognizes that absent the new statutory definition of "structural damage," there would be covered losses to buildings on the Insured Property. *See* Deposition of Tom Miller (Dkt. 45-1), pp. 74-77, 78, 83, 119.

---

[8] Great American's contention that it should be entitled to the benefit of the 2011 Amendment because it was required by law to offer sinkhole coverage in the Policy is misplaced.   Regardless of the coverage Great American was required to offer by statute, the parties' rights and obligations were controlled by the terms of the Policy. *Cf. Kingsway Amigo Ins. Co. v. Ocean Health, Inc.*, 63 So.3d 63, 68 (Fla. 4th DCA 2011) (noting that an insurer is not precluded from offering greater coverage than that required by statute); *Wright v. Auto-Owners Ins. Co.*, 739 So.2d 180 (Fla. 2d DCA 1999) (same).

In an apparent attempt to overcome the undisputed fact that retroactively applying the 2011 Amendment would adversely impact Bay Farms' entitlement to coverage under the Policy, Great American argues that the 2011 Amendment simply "clarified" the definition of "sinkhole loss" by adding a definition of "structural damage." That is, Great American argues, the 2011 Amendment merely revised section 627.706 to conform the plain language of the statute with what the Legislature purportedly intended in 2005 when it first amended the definition of "sinkhole loss" to incorporate the term "structural damage." This contention flies in the face of reason and is inapposite to well-established Florida law.

Florida courts have recognized that while "later legislative amendments meant to change a law should not be given retroactive effect, ... where the statute is being clarified, such later amendment may also be looked upon as stating what was the original legislative intent." *Kaplan v. Peterson*, 674 So.2d 201, 205 (Fla. 5th DCA 1996) (holding that pre-amendment version of statute gave rise to a private cause of action when statute was subsequently amended to clarify legislative intent to allow private causes of action). In this case, however, the 2011 Amendment cannot reasonably be viewed as a mere clarification to the definition of "sinkhole loss" intended to make the definition correspond to what had previously been supposed or assumed to be the law. As the Senate Analysis noted, there was at best uncertainty as to the meaning of "structural damage" and "sinkhole loss" prior to the 2011 Amendment.

The terms "sinkhole loss" and "structural damage" were originally used by the Legislature in 1981 when it first mandated that insurance companies offer coverage for sinkhole losses. Tellingly, while the statutory provision including those terms was amended on at least six occasions

prior to the 2011 Amendment (including on at least three separate occasions between 2005 and 2011), it was not until 2011 when the Legislature adopted the restrictive definition of "structural damage." As a result, Great American's contention that the 2011 Amendment was merely meant to clarify the Legislature's intention with respect to the meaning of "sinkhole loss" and "structural damage" is tenuous, at best. *See Laforet*, 658 So.2d at 62 (noting that "it would be absurd to consider legislation enacted more than ten years after original act as clarification of original intent"); *see also Kaisner v. Kolb*, 543 So.2d 732, 738 (Fla. 1989) ("subsequent legislatures, in the guise of 'clarification,' cannot nullify retroactively what a prior legislature clearly intended").[9]

The fact that the Enabling Act may be read to label the 2011 Amendment as a clarification (*i.e.*, a clarification of the "technical" or "scientific" definition of "sinkhole loss") is not controlling. "Just because the Legislature labels something as being remedial ... does not make it so." *Laforet*, 658 So.2d at 61. In this case, a more reasonable reading of the Enabling Act is that the new definition of "structural damage" was a revision "enacted to advance legislative intent to rely on scientific or technical determinations relating to sinkholes and sinkhole claims [and] reduce the number and cost of disputes relating to sinkhole claims ... ." *See* 2011 Fla. Sess. Law. Serv. Ch. 2011-39 , § 21; *cf. In re Eastport Associates*, 935 F.2d 1071, 1080 (9th Cir. 1991) (holding that legislature did not intend retroactive application of statute when legislative history indicated that amendment "expands" and "redefines" definition in statute).

---

[9] In contrast, when "an amendment to a statute is enacted soon after controversies as to the interpretation of the original act arise, a court may consider the amendment as a legislative interpretation of the original law and not as a substantive change thereof." *Lowry v. Parole & Probation Comm'n*, 473 So.2d 1248, 1250 (Fla. 1985). Great American has offered no evidence, either in its legal memorandum or at oral argument, demonstrating an actual controversy over the meaning of the term "structural damage" (*e.g.*, conflicting judicial or administrative interpretations).

In short, the 2011 Amendment does more than just clarify a statutory definition – it adds a new definition of "structural damage" that would substantially limit an insurance company's liability for damage resulting from sinkholes by narrowing the definition of a covered "sinkhole loss." Compare *State ex rel. Szabo Food Services, Inc. of North Carolina v. Dickinson*, 286 So.2d 529, 531 (Fla. 1973) (holding that amendment to sales and use tax statute which provided, *inter alia*, that food and drink sold ready for immediate consumption from vending machines would be an exception to the general exemption from taxation of food and drink was not a change in the law, but rather a clarification of original legislative intent).

A careful review of the cases relied on by Great American reveals that they are either not controlling or are distinguishable from this case. For example, *Szabo* did not involve the retroactive application of a purported clarifying amendment.[10] Rather, the court rejected a taxpayer's argument that because the Legislature adopted a clarifying amendment to a statute, the pre-amendment version of the statute should be construed in a manner directly inapposite to the amendment. *Szabo*, 286 So.2d at 531. In *Szabo*, the clarifying amendment was consistent with the manner in which the existing law was implemented and enacted before a case had arisen challenging the construction of the statute. *Id.* Similarly, *Kaplan* did not involve the retroactive application of a statutory amendment. Instead, the court cited a recent amendment to bolster its conclusion that private parties could bring actions against polluters under a statutory scheme designed to remedy ground and water pollution caused by leaking underground storage tanks. *Kaplan*, 674 So.2d at 205.

---

[10] In *Szabo*, a vending machine operator brought a proceeding in mandamus to compel the Department of Revenue to refund amounts allegedly improperly paid to the state for sales tax. The vending machine operator argued that vending machine sales were not taxable prior to a clarifying amendment. *Id.* at 530 The court disagreed, holding that the vending machine operator's attempt to infer an alternate meaning to statute prior to clarifying amendment was insufficient to clearly show that vending machines were exempt from taxation prior to the amendment. *Id.* at 531.

In *Lussier v. Dugger*, 904 F.2d 661 (11ᵗʰ Cir. 1990), the Eleventh Circuit held that the Civil Rights Restoration Act of 1987 (the "**CRRA**") applied retroactively to permit an employee to maintain an action for employment discrimination. *Id.* at 667. Congress enacted the CRRA in response to a Supreme Court decision narrowing the scope of coverage of the Rehabilitation Act of 1973 (the "**Rehabilitation Act**"). *Id.* at 665.[11] The CRRA amended the Rehabilitation Act to, *inter alia*, broaden the definition of covered entities to include a division of an agency even if such a division received no federal funds. *Id.* at 665 n. 5. The Eleventh Circuit noted that the CRRA "was purely remedial, enacted to assist in the struggle to eliminate discrimination from our society by ending federal subsidies of such discrimination." *Id.* at 666 (internal citations and quotations omitted). The court noted that unlike the manifest injustice that would occur when the retroactive application of an amended statute would change a grant program in which a recipient had a vested right to funding, the "rights of private parties ... are in no way implicated by retroactive application of the [CRRA]." *Id.*[12]

In contrast, in this case, there is no evidence that the 2011 Amendment was intended to correct judicial interpretations which the Legislature believed improperly applied the Florida statutory scheme governing sinkhole insurance. More importantly, retroactive application of the

---

[11] The CRRA expressly stated that it was intended to restore "the prior and consistent and long-standing executive branch interpretation and broad institution-wide application" of the Rehabilitation Act. 29 U.S.C. § 794. In addition, the legislative history demonstrated the intent of Congress that the CRRA apply retroactively (*i.e.*, to all pending cases). *Lussier*, 904 F.2d at 666-67.

[12] The court in *Lussier* held that the CRRA did not change prior legislation, but merely corrected judicial interpretations which Congress believed "unduly narrowed or cast doubt upon the broad application" of the civil rights laws. *Lussier*, 904 F.2d at 666.

2011 Amendment would directly impact the rights of private parties to insurance contracts in Florida.

Great American's reliance on *United States v. Thompson*, 281 F.3d 1088, 1092-93 (10th Cir. 2002), is also misplaced because there is no evidence that the 2011 Amendment affirmed existing precedent. *Id.* at 1092-93 (amendment to the commentary to the sentencing guidelines could be applied retroactively when it revised a commentary note, rather than guideline, affirmed prior court decisions interpreting the term at issue, and the amendment was characterized by its drafters as clarifying).[13] Finally, the substantive nature of the 2011 Amendment and its impact on vested rights also distinguishes this case from *Florida Hospital* in which the Supreme Court of Florida held that a constitutional amendment giving patients the right to know about adverse medical incidents applied retroactively so as to create a right of access to existing records. *See Florida Hospital*, 984 So.2d at 492 (holding hospitals did not have a vested right in maintaining the confidentiality of adverse medical incidents).

### *Legislative Intent Regarding Retroactive Application of the 2011 Amendment*

Since the 2011 Amendment is substantive, rather than procedural or remedial, the two-pronged analysis set forth by the Supreme Court of Florida in *Menendez* must be applied to determine whether the 2011 Amendment should be retroactively applied to modify the definition of "sinkhole loss" in the Policy. The first prong of this analysis requires the Court to discern whether there is ***clear evidence*** of legislative intent to apply the statute retroactively. As discussed below,

---

[13] As noted, the 2011 Amendment actually appears to be an attempt by the Legislature to overrule existing precedent applying the well-established rule that insurance policies be construed consistent with their plain meaning, with any ambiguity construed in favor of the insured.

the statutory text and related legislative history are, at best, ambiguous as to whether the Legislature intended the 2011 Amendment to apply retroactively.[14]

Initially, it is important to note that neither the express language of the Enabling Act nor the 2011 Amendment state in clear and unambiguous terms that the amendment should be applied retroactively. *Compare Jasinski v. City of Miami*, 269 F.Supp.2d 1341, 1346 (S.D. Fla. 2003) (finding retroactive intent when newly enacted ordinance expressly declared "the administrative fee to be legal and valid and to ratify, validate and conform in all respects the administrative fees imposed prior to the adoption of this ordinance ..."); *Campus Communications, Inc. v. Earnhardt*, 821 So.2d 388, 397 (Fla. 5th DCA 2002) (finding retroactive intent when Legislature declared in enabling act that "the exemption provided in this act should be given retroactive application because it is remedial in nature"). Similarly, the title of the Enabling Act neither expressly nor implicitly addresses the issue of retroactivity. *See Chiapetta v. Jordan*, 153 Fla. 788, 16 So.2d 641, 645 (1944) (noting title of an act may serve as evidence of legislative intent).

While section 627.706, as amended, provides that the statutory definition of "structural damage" applies to "*any* policy providing coverage ... for sinkhole losses . ...," Fla. Stat. § 627.706(2) (emphasis added), this language was in the statute prior to the 2011 Amendment.[15]

---

[14] A requirement that the Legislature "make its intention clear, helps ensure that [the Legislature] itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Landgraf*, 511 U.S. at 268. "In order to determine legislative intent as to retroactivity, both the terms of the statute and the purpose of the enactment must be considered." *Chase Federal*, 737 So.2d at 500 (citing *State ex rel. Hill v. Cone*, 191 So. 50, 57 (Fla. 1939)). Nonetheless, the mere fact that "retroactive application of a new statute would vindicate its purpose more fully ... is not [a] sufficient [justification] to rebut the presumption against retroactivity." *Landgraf*, 511 U.S. at 285-86; *see Arrow Air*, 645 So.2d at 425.

[15] On the other hand, the statute also contains language suggesting that it applies only to post-enactment conduct. For example, the statute provides that insurers "*must provide* coverage for catastrophic ground cover collapse" and "*shall make available* ... coverage for sinkhole losses on any structure ... ." Fla. Stat. § 627.706(1)(a), (b) (emphasis added).

Moreover, although a subsection of the definition of "structural damage" expressly purports to apply to damage "occurring on or after October 15, 2005," Fla. Stat. § 627.706(2)(k),[16] the mere fact that some words in the statute become surplusage without a retroactive application does not, standing alone, render intent sufficiently clear to overcome the presumption against retroactivity. *See In re Eastport Associates*, 935 F.2d at 1080.

The Enabling Act is equally unclear as to whether the Legislature intended for the 2011 Amendment to apply retroactively.  For example, the Enabling Act indicated that certain "technical or scientific definitions adopted in the 2005 legislation are clarified to implement and advance the Legislature's intended reduction of sinkhole claims and disputes."  Arguably, this language could be construed to mean that the Legislature intended that the new definition of "structural damage" be applied retroactively as nothing more than a clarification of what constitutes "sinkhole loss" under Florida law.  In contrast, the new definition of "structural damage" could also be viewed as a "revision[] ... enacted to advance legislative intent to rely on scientific or technical determinations relating to sinkholes and sinkhole claims [and] reduce the number and cost of disputes relating to sinkhole claims ... ."  *Id.*

Finally, although the final version of the Enabling Act adopted by the Legislature deleted language in prior versions that would have expressly precluded the retroactive application of the 2011 Amendment, *see* FL Staff An., S.B. 408, 5/5/2011,[17] the Legislature's failure to include

---

[16] Section 5 of the definition of "structural damage" was added by House Amendment 1.  *See* FL Staff An., S.B. 408, 5/5/2011.

[17] Rather than clearly express a legislative intent in favor of retroactive application, the final version of the Enabling Act could be viewed as a compromise demonstrating nothing more than that the Legislature (*i.e.*, the House and Senate) agreed to disagree about whether and to what extent the 2011 Amendment would apply to existing claims and policies.  *See Landgraf,* 511 U.S. at 262-63.

language expressly limiting the retroactive effect of the amendment cannot be construed as clear evidence of legislative intent for retroactive application. *See Florida Ins. Guaranty Ass'n, Inc. v. Devon Neighborhood Ass'n, Inc.*, 67 So.3d 187, 197 (Fla. 2011) ("the ***absence*** of a statement in the act that the amendments are inapplicable to existing contracts does not constitute clear evidence of retroactive intent").[18]

While a review of the Enabling Act and legislative history suggest that at least some members of the Legislature intended for the amendment to apply retroactively, the issue is not whether the Court can infer that the Legislature intended for the 2011 Amendment to apply retroactively, but whether there is ***clear evidence*** of such intent. *See Keystone Water Co. v. Bevis*, 278 So.2d 606, 608 (Fla. 1973) (holding that a statute "is not to be given retrospective application unless it is required by the terms of the Statute or it is unequivocally implied"). In this case, neither the express language of the Enabling Act nor the legislative history provide clear evidence of legislative intent in favor of retroactive application of the 2011 Amendment.

### *Constitutionality of Retroactive Application*

Even assuming that the Legislature clearly evidenced its intent to retroactively apply the 2011 Amendment, the Court must still consider whether such application would violate the Florida and/or U.S. Constitution. *See Manning v. Travelers Ins. Co.*, 250 So.2d 872, 874 (Fla. 1971) (recognizing

---

[18] The Court rejects Bay Farms' contention that because the Enabling Act contained an effective date (*i.e.*, the date it became law) a presumption arises against retroactivity. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) ("To the contrary, we understand the instruction that the provisions are to 'take effect upon enactment' to mean that courts should evaluate each provision of the Act in light of ordinary judicial principles concerning the application of new rules to pending cases and preenactment conduct."). Moreover, this is not a situation where the Legislature intended the amendment to go into effect on a future date certain, rather the Enabling Act provided: "[E]xcept as otherwise expressly provided in this act, this act shall take effect upon becoming law." 2011 FL S.B. 408, § 32; *see also Monoson v. United States*, 516 F.3d 163, 167 (3d Cir. 2008) (noting that in *Landgraf* the Court implicitly suggested that a statement a statute will take effect on a certain date was not the equivalent of a clear directive that the statute operate only prospectively).

that when a statute has the effect of rewriting an antecedent contract or, more specifically changing the substantive rights of the parties to an existing contract, retroactive application is constitutionally prohibited regardless of legislative intent. Retroactive application of a civil statute ordinarily transgresses constitutional limitations on legislative power "if the statute impairs vested rights, creates new obligations, or imposes new penalties." *LaForet*, 658 So.2d at 61 (holding that statute expanding damages recoverable in statutory bad faith action against insurer could not constitutionally be applied to causes of action accruing prior to enactment of statute). The invalidation of retroactive civil legislation which "impairs vested rights, creates new obligations[,] or imposes new penalties" ordinarily is based on the conclusion that the legislation violates due process. *Id.*[19]

The Supreme Court of Florida has repeatedly recognized that "subsequent legislation which diminishes the value of a contract is repugnant to [the Florida] Constitution." *Dewberry*, 363 So.2d at 1080; *see Yamaha Parts Distributors, Inc. v. Ehrman*, 316 So.2d 557, 559 (Fla. 1975); *R.A.M.*, 869 So.2d at 1217; *Rorick v. Board of Commissioners of Everglades Drainage District*, 57 F.2d 1048, 1055 (Fla. N.D. 1932); *Moore v. Branch*, 5 F.Supp. 1011, 1012 (Fla. S.D. 1934). As the Supreme Court of Florida stated in *Pinellas County v. Banks*, 19 So.2d 1 (Fla. 1944): "Any conduct on the part of the legislature that detracts in any way from the value of the contract is inhibited by

---

[19] While Florida courts have been loath to formulate a definition of "vested right" that can be applied in all cases with precision and certainty, a general definition is found in *City of Sanford v. McClelland*, 163 So. 513 (Fla. 1935), wherein the court held that "[a] vested right has been defined as 'an immediate, fixed right of present or future enjoyment' and also as 'an immediate right of present enjoyment, or a present, fixed right of future enjoyment.'" *Id.* at 514-15 (citing *Pearsall v. Great N. Ry. Co.*, 161 U.S. 646 (1896)).

the Constitution." *Id.* at 3 (citing *State of Louisiana v. City of New Orleans*, 102 U.S. 203 (1880); *Edwards v. Kearzey*, 96 U.S. 595 (1877)).[20]

Bay Farms' vested contractual right to coverage under the Policy would be substantially impaired by a retroactive application of the 2011 Amendment. That is, if applied retroactively, the 2011 Amendment would severely restrict the degree of sinkhole coverage that Bay Farms contemplated and contracted for in 2008 when it purchased the Policy. In addition, Great American's contention that this Court should apply the 2011 Amendment to preclude Bay Farms from recovering on a claim (and potential cause of action) that accrued prior to the effective date of the 2011 Amendment is contrary to the general rule that once a cause of action has accrued, the right to pursue that cause of action is generally considered a vested right. *See R.A.M.*, 869 So.2d at 1220.

This is not a situation where the Legislature is entitled to retroactively apply a substantive amendment because an individual has merely an "expectation" rather than a "vested right" that existing law would continue indefinitely into the future. *See Jasinski*, 269 F.Supp.2d at 1346 (holding plaintiff's purported right to refund of improperly enacted administrative charge was based on a mere expectation that the state of the law prior to the enactment of an ordinance ratifying the

---

[20] The constitutional prohibition against retroactive application of statutes impairing vested rights is not avoided simply because the 2011 Amendment may have been a valid exercise of the state's police powers, *see* 2011 Fla. Sess. Law. Serv. Ch. 2011-39 , § 21(3) ("the Legislature finds that losses associated with sinkhole claims adversely affect the public health, safety, and welfare of this state and its citizens"). *See Yamaha Parts*, 316 So.2d at 559 (recognizing that "[v]irtually no degree of contract impairment has been tolerated in [Florida]"); *see also State Farm Mut. Auto. Ins. Co. v. Gant*, 478 So.2d 25, 27 (Fla. 1985) (holding that statutory amendment allowing an insured to stack uninsured motorist coverage in insurance policy could not constitutionally be applied to overcome an antistacking provision in an insurance policy entered into before the effective date of the amendment).

fee would continue – not a vested right to a refund of the administrative fee).[21]  Moreover, this is not

a case in which the Policy expressly provided that both parties agreed to be bound by future changes

in the Florida statutory scheme governing sinkhole insurance.  *See Maison Grande Condo. Ass'n,*

*Inc. v. Dorten, Inc.*, 600 So.2d 463, 464 (Fla. 1992) (holding escalation clause in condominium

recreation lease that was entered into before enactment of statute prohibiting such clauses was

enforceable after enactment of statute purporting to apply the prohibition to all existing and future

contracts when lessor had not agreed to be bound by future changes in the condominium act); *Stangl*

*v. Occidental Life Ins. Co. of North Carolina*, Case No. CIV-09-1164-R, 2011 WL 3628965 (W.D.

Okla. Aug. 16, 2011) (holding that when parties explicitly agreed that policy would be

"automatically amended to comply with state law," retroactive application of state law defining

terms in policy did not amount to substantial impairment of contract rights).

In this case, Bay Farms had a vested contractual right to coverage for "sinkhole loss" as that

term was understood when the Policy was issued (or, at the very latest when the loss occurred and

the claim was submitted).  *See Johnson v. Government Employees Ins. Co.*, 333 So.2d 542, 545 (Fla.

3d DCA 1976) ("[c]ontracts are made in legal contemplation of *existing* applicable statutes" )

(emphasis added).  Thus, the constitutional prohibitions against retroactive application of legislation

---

[21] Similarly, this is not a situation where retroactive application is justified because a taxpayer seeks to recover a windfall *vis-à-vis* the government due to a deficiency in a previously enacted statute or ordinance. *See Jasinski*, 269 F.Supp.2d at 1346 (retroactively applying curative ordinance when failing to do so would place the individuals' interest in benefitting from the City's mistake before the public interest in the government's proper administration); *cf. Szabo*, 286 So.2d at 531 (refusing to infer ambiguity in previous version of statute based on subsequent amendment so as to allow vending machine operate to recover refund of amounts allegedly improperly paid for sales tax).  Nor is this an instance where the Legislature enacted curative legislation that applied retroactively to ratify, validate or confirm a prior technically deficient procedural act that it could have authorized in the first place. *Compare County of Palm Beach v. State*, 342 So.2d 56 (Fla. 1976); *Coon v. Board of Pub. Instr. of Okaloosa Co.*, 203 So.2d 497, 498 (Fla. 1967); *State v. County of Sarasota*, 155 So.2d 543, 546 (Fla. 1963); *Sullivan v. Volusia Co. Canvassing Bd.*, 679 So.2d 1206, 1207 (Fla. 5th DCA 1996).

impairing vested and contractual rights precludes the Court from applying the newly adopted

definition of "structural damage" to effectively extinguish Bay Farms' rights under the Policy. *See*

*Association of Golden Glades Condo. Club, Inc. v. Security Management Corp.*, 557 So.2d 1350,

1356 (Fla. 1990) (McDonald, J., concurring) ("No matter how hard the legislature may try, it cannot

affect the terms of a contract unless the contracting parties indicated an intent to allow it to do so and

agreed to follow future legislative enactments."); *see also Dewberry*, 363 So.2d at 1080 (holding that

obligation of insurance contract providing for the stacking of uninsured motorist coverage was

impaired by application of statute prohibiting such stacking to contract entered before effective date

of statute); *Fleeman v. Case*, 342 So.2d 815, 818 (Fla. 1976) (holding retroactive application of

statute prohibiting rental escalation clauses in certain leases would be invalid as an impairment of

the obligation of statute in violation of federal and state constitutional provisions); *Yamaha Parts*,

316 So.2d at 559 (holding that retroactive application of statute requiring ninety days' notice for

termination of franchise agreements would unconstitutionally impair the obligation of contract if

applied to contracts entered into before the effective date of statute); *Lumbermens*, 440 So.2d at 613

(holding application of statute that required insurance companies to advise purchaser of the need for

collateral insurance to contracts entered into before the effective date of the amendment would

constitute legislative impairment of contract in violation of the Florida Constitution).[22]

---

[22] Because retroactive application of the 2011 Amendment would result in an immediate diminution in the value of the Policy to Bay Farms, the Court need not apply the balancing test enunciated by the Supreme Court of Florida in *Pomponio v. Claridge of Pompano Condo., Inc.*, 378 So.2d 774, 780 (Fla. 1979). *See Coral Lakes Community Ass'n, Inc. v. Busey Bank, N.A.*, 30 So.3d 579, 585 (Fla. 2d DCA 2010); *Sarasota County v. Andrews*, 573 So.2d 113, 115 (Fla. 2d DCA 1991). In any event, even applying the balancing test enunciated in *Pomponio*, retroactive application of the 2011 Amendment would still be barred by the Constitution. *See Pomponio*, 378 So.2d at 780 (weighing degree to which a party's contract rights are statutorily impaired against both the source of authority under which the state purports to alter the contractual relationship and the evil it seeks to remedy). Retroactive application of the 2011 Amendment would substantially impair Bay Farms' vested right to insurance coverage for sinkhole losses under the Policy and severely, permanently, and immediately change the parties' economic relationship. *See Coral Lakes*, 30 So.3d at 585.

## Conclusion

For the forgoing reasons, the Court concludes that the definition of "structural damage" in the 2011 Amendment cannot be applied retroactively to narrow the scope of coverage afforded Bay Farms under the Policy.[23]   Accordingly, it is

**ORDERED AND ADJUDGED** that:

(1)    Bay Farms Corporation's Opposition Motion for Partial Summary Judgment (Dkt. 45) is **GRANTED**.

(2)    Defendant, Great American Alliance Insurance Company's Cross-Motion for Partial Summary Judgment (Dkt. 46) is **DENIED**.

(3)    The Court will not apply the definition of "structural damage" contained in Section 627.706(2)(k), Florida Statutes, when construing the same term in the Policy.

**DONE AND ORDERED** in chambers this _6th_ day of December, 2011.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to:
Counsel of Record

---

[23] This result is consistent with at least one recent state court decision refusing to retroactively apply the 2011 Amendment and a September 13, 2011 letter from the Florida Department of Financial Services (which is statutorily empowered to adopt procedures governing the neutral evaluation process) directing Neutral Evaluators to only apply the new definition of "structural damage" to policies with an effective date on or after May 17, 2011. *See* Order Denying Defendant's Motion for Application of a Technical Definition of "Structural Damage," *Jackson v. USAA Casualty Ins. Co.*, No. 10-13586 (Fla. 13th Jud. Cir. July 5, 2011); www.cftlawnews.com/uploads/7356_pre_and_post_5-17_letter1.pdf (last visited November 29, 2011).